1        **IN THE UNITED STATES DISTRICT COURT**
           **SOUTHERN DISTRICT OF FLORIDA**

2

             **MIAMI DIVISION**

3
        **CASE NO.:  18-cv-21727-MGC**

4

5

6

7 JESSICA LAGOS,       )
                   )

8      Plaintiff,    )        January 18, 2019
                   )

9 v.                )
                   )        Pages 1 - 52

10 UNUM LIFE INSURANCE   )
COMPANY OF AMERICA,   )

11               )
      Defendant.    )

12 _____/

13

14

15               DISCOVERY HEARING

16

      BEFORE THE HONORABLE JONATHAN GOODMAN

17        UNITED STATES MAGISTRATE JUDGE

18

19

20

  APPEARANCES:

21

  On behalf of the Plaintiff:

22

             DABDOUB LAW FIRM, P.A.

23            1600 Ponce de Leon Blvd
            Suite 1205,

24            Coral Gables, FL 33134
            BY:  EDWARD P. DABDOUB, ESQ.

25

```
 1   APPEARANCES CONTINUED:

 2   On behalf of Plaintiff:
                           LAW OFFICES OF KEVIN P. SCHAEFER
 3                         13255 S.W. 113 Terrace
                           Miami, FL 33186
 4                         BY:  KEVIN P. SCHAEFER, ESQ.

 5


 6
     On behalf of the Defendant:
 7
                           MCDOWELL HETHERINGTON LLP
 8                         2101 NW Corporate Boulevard
                           Suite 316,
 9                         Boca Raton, FL 33431
                           BY:  KRISTINA B. PETT, ESQ.
10                         BY:  DANIELLE E. SHURE, ESQ.

11


12

13   Transcribed By:

14                         BONNIE JOY LEWIS, R.P.R.
                           7001 SW 13 Street
15                         Pembroke Pines, FL  33023
                           954-985-8875
16                         caselawrptg@gmail.com.

17

18

19

20

21

22

23

24

25
```

```
 1              (Thereupon, the following proceedings were held:)
 2              THE COURTROOM DEPUTY:  All rise.
 3              The United States District Court for the Southern
 4   District of Florida is now in session.  The Honorable Jonathan
 5   Goodman presiding.
 6              Calling Case Number 18-cv-21727-Cooke; Lagos versus
 7   UNUM Life Insurance Company of America.
 8              THE COURT:  Thank you.  Good afternoon.
 9              Please be seated.  And folks, I apologize for being
10   seven minutes late.
11              I always try to pride myself of being on time and I
12   did not meet my goals today.  I was on the phone.  And
13   sometimes when you are on the phone, you just can't get off
14   despite your best efforts and I am sorry about that.
15              In any event, happy Friday to all of you.  Let's start
16   off with appearances starting first with the Plaintiff, please.
17              MR. DABDOUB:  Good afternoon, Your Honor.  Edward
18   Dabdoub for Plaintiff.
19              MR. SCHAEFER:  Good afternoon, Your Honor.  Kevin
20   Schaefer for Plaintiff.
21              MR. DABDOUB:  Your Honor, if it's okay with you, Miss
22   Burgos hasn't filed a notice of appearance just yet.  Mr.
23   Schaefer did, but if it is okay, could she sit at counsel's
24   bench today?
25              THE COURT:  Sure.  Just tell me your colleague's name,
```

1  the one sitting two seats over from you.

2          MS. BURGOS:  Geannina Burgos.

3          THE COURT:  And you are a member of the same firm?

4          MS. BURGOS:  Yes, Your Honor.

5          THE COURT:  All right.  That's fine.  By the way, is

6  it pronounced UNUM or UNIM (phonetic)?

7          MS. BURGOS:  UNUM.

8          THE COURT:  UNUM.  Okay.  Very good.  And so who is

9  here on behalf of UNUM?

10         MS. PETT:  Your Honor, Kristina Pett on behalf of UNUM

11 along with --

12         MS. SHURE:  Danielle Shure on behalf of UNUM.

13         THE COURT:  Very well.  So, Miss Shure, according to

14 our docket sheet, it still has you listed as being with the

15 United States District Court Middle District in Jacksonville.

16 Is that a former address of yours?

17         MS. SHURE:  Yes, I was a former law clerk for Judge

18 Marcia Morales Howard.

19         THE COURT:  All right.  So maybe the Clerk's Office

20 needs to update your contact information.

21         MS. SHURE:  Absolutely, Your Honor.

22         THE COURT:  When did you leave the Clerk's Office and

23 join your current firm?

24         MS. SHURE:  In November.  So I have to update.

25         THE COURT:  Right.  All right.  When you get a chance

1  you may want to do that.

2           So, folks, I am here to deal with some of these

3  discovery disputes.  And before I do that, let me ask you the

4  question that I usually try to remember to ask, which is have

5  you resolved any of the disputes since we've received your

6  notice of hearing?

7           MS. PETT:  I think we agreed to amend an additional

8  response.

9           THE COURT:  Fair enough.  I guess that's good to hear

10 better that something gets resolved.

11          So I'm happy to dive right into it in whatever order

12 you would like to handle this is fine by me.

13          Let me just ask a quick question as sort of threshold

14 matter so I can tell whether or not there are any disputes on

15 the law.  Bear we me just a minute, please.

16          All right.  So does the Plaintiff agree that the

17 arbitrary and capricious standard applies?

18          MR. DABDOUB:  We do.

19          THE COURT:  All right.  And do both sides agree that

20 the standard or approach outlined in the *Cerrito* case is the

21 applicable framework.

22          MS. PETT:  Yes, Your Honor.

23          THE COURT:  Plaintiff?

24          MR. DABDOUB:  Indeed.

25          THE COURT:  All right.  And I see also one of the

```
 1  other cases that was cited, I think it was actually mentioned
 2  in the objections by the Defendant.  You cited some cases
 3  including Cerrito.  And then, you also cited a case called
 4  Emory v. American Airlines, which is a decision by United
 5  States Magistrate Judge Barry Garber.
 6          So I assume since you are citing it, you think that
 7  that's a correct statement of the law?
 8          MS. PETT:  Yes, Your Honor.
 9          THE COURT:  And Plaintiff, do you think that that
10  opinion is also a valid correct statement of the law?
11          MR. DABDOUB:  Yes, it follows Cerrito.
12          THE COURT:  Okay.  Well, good.  So at least we are on
13  the same page concerning the law.
14          So what would you like to take up first?
15          MR. DABDOUB:  Well, I --
16          THE COURT:  Donna, hi, everything okay?
17          UNIDENTIFIED FEMALE SPEAKER:  Yes.
18          THE COURT:  Come on in.
19          Bear with me just a second, folks.
20          Donna, you don't need to run out of here.  You can
21  walk out at a regular pace.
22          UNIDENTIFIED FEMALE SPEAKER:  Okay.  Thank you.
23          THE COURT:  Relax.  Don't worry.
24          UNIDENTIFIED FEMALE SPEAKER:  Sorry.
25          THE COURT:  Give me ten pushups, though.
```

```
 1            Okay.  I'm all ear, so to speak.  What are we handling
 2   first?
 3            MR. DABDOUB:  Your Honor, I think we have the
 4   convenience of efficiency today in that the discovery requests
 5   can be grouped into four general topics.
 6            THE COURT:  Yes.
 7            MR. DABDOUB:  And if we could just talk about the
 8   first one.  I should preference my discussion with you by
 9   pointing out as we ordinarily do as firm that focuses on ERISA
10   insurance claims, we purposely tailored our discovery knowing
11   full well we probably would be before the Court on the nearest
12   discovery dispute.  It's nothing strange to us.  So when we
13   craft our discovery we do keep that in mind.
14            If I may, just briefly introduce my client.  She was a
15   young trial attorney for a big defense firm here in South
16   Florida.  She is --
17            THE COURT:  Is your client sitting behind you?
18            MR. DABDOUB:  No, Your Honor.  She's severely ill.
19   She isn't able to be here.
20            THE COURT:  Is that somebody who is part of your legal
21   team?
22            MR. DABDOUB:  This is Bryn Natland.  She is an
23   associate in the firm.  She wanted to observe the hearing
24   today.
25            THE COURT:  She wanted to see how not to handle a
```

1    discovery hearing.

2         MR. DABDOUB:  Precisely.

3         THE COURT:  Good.  Perfect you've selected the right

4    guy.

5         MR. DABDOUB:  And when our client was practicing law

6    she fell severely ill and submitted her disability claim to

7    UNUM, which was reviewed.

8         Based on her medical records her benefits were

9    approved and she was paid benefits from July of 2015 through

10   February of 2017 when UNUM made the determination to terminate

11   her benefits, despite no change in her medical condition as

12   seen from her medical records or reality and without stopping

13   to conduct an independent medical examination, something which

14   it had a right to do under the disability insurance policy.

15        THE COURT:  Right.  So I seem to remember, and

16   obviously every case stands on its own, but perhaps just for

17   the simple goal of demonstrating to you that I do remember

18   certain matters, I recall that we had a similar case a few

19   years ago with a client who had received disability benefits

20   for some period of time.

21        And then, there was a termination and there did not

22   appear to be any medical basis.  At least that was your

23   perspective.  No medical reason in the record.

24        So this case, to that extent, reminds me of that old

25   case.  Whatever my rulings were in that case, I don't remember,

1  but even if I did remember this, of course, is a completely

2  independent matter and a brand new case, but I do remember we

3  had a similar fact pattern a few years ago.

4           MR. DABDOUB:  The Court is correct.

5           THE COURT:  And I think, just to further dazzle you,

6  was the opposing law firm either Shutts and Bowen or Broad and

7  Cassel.

8           MR. DABDOUB:  Your memory is impeccable.  The former.

9           THE COURT:  And the gentleman in Court was the tall

10 fellow, if I remember, right?

11          MR. DABDOUB:  Yes, Mr. Dawson.

12          THE COURT:  There you go.  Okay.  I have now exhausted

13 my memory.

14          MR. DABDOUB:  Yes, impeccable memory.

15          THE COURT:  All right.  I'm listening.

16          MR. DABDOUB:  Well, on the first topic of paid

17 recoveries, we have obtained documents and reports from UNUM.

18 These are UNUM documents and reports.

19          THE COURT:  I'm sorry for interrupting.

20          Although a minute ago I was trying to show off with my

21 memory of this other matter, when I don't know something, I

22 don't hesitate to tell you that I don't know.

23          So this particular term, paid recovery, I am not sure

24 what it means.  So before you start explaining and arguing,

25 what exactly does that mean, paid recovery?

1        MR. DABDOUB:  According to two depositions from

2    assistant vice presidents from UNUM, it means paid recovery is

3    a term that UNUM uses to mean benefits were terminated.

4        So, in terms of Miss Lagos' claim, she is considered a

5    paid recovery because her benefits were terminated.

6        THE COURT:  Thank you.

7        MR. DABDOUB:  We have obtained UNUM documents and

8    reports from other cases around the country.  Including these

9    two deposition transcripts of the assistant vice presidents

10   that essentially shows that UNUM has a monthly plan

11   expectations -- that's UNUM can's terminology -- for paid

12   recoveries.  UNUM terminology.

13       When benefits are terminated there are reserves set

14   aside for any given claim, such as Miss Lagos, are then

15   released.  Meaning, they are no longer held in the account to

16   pay the claim because the claim closes.

17       According to these depositions, UNUM sets monthly

18   targets for paid recoveries.  According to one of these

19   depositions the AVP testified that this could be, in this terms

20   of a monetary sum, up to 10 to 12 million dollars a month of

21   paid recoveries.

22       We have a document from UNUM with the names, the claim

23   numbers, and the actual reserves on it, which seem to identify

24   potential claim recoveries.  This document was discussed in the

25   deposition by the AVP.

1          According to the deposition, this deposition and the

2     information on it was disseminated in the claims department

3     responsible for reviewing claims.

4          THE COURT:  And did it list the targets by name?

5          So, for example, if UNUM was seeking to terminate 10

6     to 12 million dollars per month, would it list particular

7     insureds who were receiving benefits, or would it just list in

8     a more general generic way?

9          MR. DABDOUB:  It has the name of the insured, the

10    insured's claim number, Social Security number, and the

11    reserves set beside it.  Then --

12         THE COURT:  And was your client's name on that list?

13         MR. DABDOUB:  We obtained this from other case and

14    this list predates our client's termination.

15         Based on information and belief, this recovery plan

16    was still in place at the time our client's benefits were

17    reviewed and terminated.

18         We also understand, from the depositions, that UNUM

19    was careful not to keep this information electronic, but

20    instead to have meetings where the information was shared from

21    the vice president to the assistant vice president, who shared

22    it with the director, who then shared it with the disability

23    specialist who is the person responsible for reviewing claims.

24         According to the depositions, this was not information

25    that would ever be found in an insurance company's claim file.

1        THE COURT:  So it wouldn't technically be part of the

2   administrative record, but it might influence a decision to

3   terminate.  That's your position?

4        MR. DABDOUB:  That is our position.

5        We also have another document that shows that UNUM was

6   tracking the actual terminations versus the projected

7   terminations based on some percentage of their target.  So if

8   they had, say, a 100 in a month and they set 80 it would show

9   80 percent of their planned projections.

10       We also, from the depositions, understood that the

11  assistant vice presidents and the directors' evaluations were

12  based in part on their performance in these recovery plans as

13  were their compensation.  I believe the words he used in the

14  deposition were incentive compensation.

15       I would suggest to the Court that we have very little

16  knowledge beyond that of what UNUM is up to, but it smells

17  rotten, and I think it shows a conflict of interest on the part

18  of UNUM if you were setting monthly target plans and then

19  tracking it to see if you are making your projections.  I think

20  we have provided a sufficient basis to obtain discovery

21  responses on the paid recovery plan.

22       The Defendant, in responding to all of our discovery

23  on this topic, does not deny the existence of the plan, but

24  instead merely states the person reviewing the claim did not

25  consider any information relating to it.

1          I suggest UNUM would have had no other answer it could

2    offer because if it admitted the reviewing analyst person

3    analyzing the claim had this information and used it, it would

4    be an admission of guilt.

5          And the paid recovery covers, under topic A for

6    interrogatories, we are looking at 18 through 23 and request

7    for production 14 through 19.

8          THE COURT:  I understand.  And then, also a similar

9    topic under request for admissions?

10         MR. DABDOUB:  Indeed.

11         And the words would be implicated because the

12   termination of benefits allows them to shift of the reserves

13   away.

14         THE COURT:  So, before we get into the specific

15   request for production and before we get into the specific

16   interrogatories, let me give UNUM the opportunity to respond

17   from sort of a broad picture, just as you gave me from your

18   view, a general overview of what you think is important.

19         Let me hear a response from UNUM on that.

20         MS. PETT:  Yes, Your Honor.

21         The important part of the information that counsel has

22   left out is that the information that he obtained is

23   information out of the UNUM Worcester Massachusetts office

24   where individual disability claims are being handled.  This

25   claim is a group disability claim and that information was not

1    part of this claim.  That is why Miss Lagos is not on any list.

2           Also, we filed an affidavit declaration of the

3    director in this case who says that she did not consider or

4    review any information concerning recoveries with respect to

5    this claim.

6           And recoveries, also the way that Plaintiff's counsel

7    has framed it, has made it seem like it is some nefarious plot

8    to deny claims.  Recoveries are forecasts.

9           They are forecasts that all insurance companies put

10   together saying, okay, we have so many claims.  We look at

11   demographics.  We look at impairments.  We look at age.  And we

12   determine in the future how many claims are going to -- how

13   long the claim is going to last.  When they think the claim is

14   going to end, et cetera.  So it is not this nefarious plot to

15   deny claims.

16          Also, with respect, Your Honor, this is an ERISA case.

17   We all agreed what the rule is.  The issue in this case is

18   whether a conflict existed and we agree that there is a

19   structural conflict because the insurance company pays the

20   benefits out of its assets.

21          And in this particular case, was the decision tainted

22   or was it a factor in making the decision and that's it.  This

23   discovery that is being sought is discovery that is being

24   permitted, other than this one California case where there was,

25   I believe, a couple of these things permitted, but the request

1    in that case was also more limited than this case.

2           The way the request is phrased by counsel here, it

3    requests all documents concerning recoveries anywhere for this

4    period of time which may relate to Miss Lagos, which means any

5    particular claim the way he is trying to lump group disability

6    in with individual disability claims.

7           It's a different area.  Those assistant vice president

8    depositions, he's taking a little bit that was testified in

9    those cases and spouting it here without providing me or you

10   with those transcripts so we can see the whole transcript in

11   the picture and what the cross-examination was in that case.

12          So, I mean, this a type of discovery that goes on in

13   RICO cases.  The Court has to look at proportionality as well

14   and this is a simple ERISA case.  It is a $5,000 a month

15   benefit with a Social Security offset.

16          And the type of discovery we're looking at is some

17   sort of scorched discovery to determine whether UNUM is a bad

18   company overall.  And not whether, in this particular case,

19   whether its decision was correct or reasonable and whether the

20   conflict of interest played any sort of role in that decision.

21          THE COURT:  So who actually made the decision to

22   terminate the benefits in this case?  Was it the person who

23   signed the affidavit in this case?

24          MS. PETT:  No, Your Honor.

25          THE COURT:  No.

1      MS. PETT:  The decision was the person below her.  She

2  approved it.  She approved the denial.

3      THE COURT:  So there was an analyst that made the

4  termination decision or termination recommendation.  And then,

5  it went up the ladder.

6      MS. PETT:  To the director.

7      And the director said she didn't look at any reserve

8  information.  She didn't look at any recovery information.  She

9  did not utilize it at all in making the decision to approve the

10  analyst's decision.

11      THE COURT:  I'm sorry.  Let me just make sure I am

12  getting all the terminology down.  The ultimate decision was

13  made by -- what's the title?

14      MS. PETT:  The ultimate decision was made by the

15  disability benefits specialist.  That was before the appeal,

16  though, during the initial claim.

17      THE COURT:  The disability benefits specialist, but

18  who was it that made the recommendation?

19      MS. PETT:  She did.  The individual disability

20  specialist --

21      THE COURT:  Made a recommendation.

22      MS. PETT:  Well, she actually gets to make the

23  decision.  And then, the director will approve of whether she

24  agrees or disagrees with it.

25      THE COURT:  The director approves?

```
 1              MS. PETT:  Yes.

 2              THE COURT:  All right.  And who is the director?

 3              MS. PETT:  Amy Butler.

 4              THE COURT:  And she's the one who has filed the

 5   affidavit?

 6              MS. PETT:  The declaration, yes.

 7              THE COURT:  And Miss Butler's affidavit or declaration

 8   says I didn't consider any of these paid recoveries?

 9              MS. PETT:  Correct.

10              THE COURT:  And what about the specialist?

11              MS. PETT:  It also says that the specialist didn't

12   consider any of the paid recoveries because the specialist

13   doesn't have access to information like that.

14              THE COURT:  And what is the name of the disability

15   benefits specialist?

16              MS. PETT:  Nicole Cribbs.

17              THE COURT:  Cribbs?

18              MS. PETT:  Cribbs; C-R-I-B-B-S.

19              THE COURT:  All right.  So what is your response to

20   that?

21              MR. DABDOUB:  Well, the declaration can filed by Miss

22   Amy Butlers is verbatim, the same declaration filed in the *Gray*

23   *v. UNUM* case coming out of California, which as the Court is

24   aware, the Ninth Circuit has some of the most restrictive ERISA

25   discovery case law and the Court still granted these similar
```

1  discovery requests on the paid recoveries based on the same

2  information.

3          So Miss Butler's declaration, being verbatim of some

4  other director's declaration in that other case, carries very

5  little weight to us.  I sincerely doubt Miss Butler wrote a

6  word of it herself.

7          MS. PETT:  Your Honor, it wasn't verbatim.

8          THE COURT:  Well, you can probably say that about

9  every affidavit and every declaration ever filed in a lawsuit.

10 The reality is lawyers draft affidavits or declarations.

11         And then, the person signing it -- I'm never sure if

12 the word is pronounced affiant or affiant.  So I just say the

13 person who signed the affidavit.  That person attests to the

14 accuracy, but the actual wording and phrasing and organization

15 that's all by lawyers.

16         So I am not particularly impressed either way that

17 this particular person didn't draft it.  So that is to be

18 expected.

19         So have you taken the deposition in this case of

20 either Miss Cribbs or Miss Butler?

21         MR. DABDOUB:  Fully intend to after obtaining the

22 documents that we need.

23         THE COURT:  So you want to get the documents first and

24 then take the depositions?

25         MR. DABDOUB:  Yes, Your Honor.

```
 1            THE COURT:  Now, these deposition excerpts that you
 2   were referencing, those are from a different case?
 3            MR. DABDOUB:  Yes, Your Honor.
 4            THE COURT:  And that list that you mentioned is from
 5   another case?
 6            MR. DABDOUB:  Yes.
 7            THE COURT:  And the other case involved an individual
 8   policy and this one here is a group policy?
 9            MR. DABDOUB:  Indeed.
10            THE COURT:  Would that matter based on your
11   experience?
12            MR. DABDOUB:  Absolutely not.  And if I just may say
13   why.
14            THE COURT:  Sure.
15            MR. DABDOUB:  Generally it is accepted nationwide that
16   in ERISA cases you have very little, and in some circuits, no
17   discovery.
18            So what I am hearing counsel say, is to the extent
19   that we did something bad on the IDI side, were we only doing
20   it on the side of where you could actually get discovery and we
21   could get hit with bad faith damages.
22            But on the ERISA side we are very good at hiding and
23   in not getting discovery.  We wouldn't do it there.  It doesn't
24   make sense to me.  Whether it is group insurance or individual
25   insurance it operates the same way.
```

1      THE COURT:  So let me ask UNUM.

2      You made a distinction between an individual policy

3  and a group policy, but if there is a disability claim that is

4  being analyzed, why would it matter that one is being analyzed

5  as an individual policy and one claim is being analyzed as part

6  of a group policy?  What is the difference?

7      MS. PETT:  They are being analyzed in different

8  locations and they have different procedures on how to analyze

9  different claims because under ERISA there are special ERISA

10 regulations that the claims analyst and the directors have to

11 follow and be in compliance with ERISA.

12      And what I am saying is, he is taking testimony from a

13 case that was handled in a completely different location for

14 individuals who have not been involved in this claim.

15      THE COURT:  So what you are saying is the other case

16 was a non ERISA case?

17      MS. PETT:  Correct.

18      THE COURT:  And this is an ERISA case?

19      MS. PETT:  Correct.

20      THE COURT:  And the ERISA case is governed by certain

21 ERISA statutes and regulations that are inapplicable in the non

22 ERISA setting?

23      MS. PETT:  Correct.

24      THE COURT:  What do you say about that?

25      MR. DABDOUB:  It makes not a difference in the world,

1   Your Honor.  When the claims reviewer is sitting there

2   reviewing the claims and her director has information under

3   reserves and targets to terminate a certain amount of claims

4   and the downward pressure is felt, she will deny the claim and

5   the director will approve it.  Common sense prevails.

6          Your Honor, these arguments were made by UNUM in the

7   *Gray* case.  They said not on the ERISA side.  Only on the IDI

8   side, the individual side, the Court didn't buy it.  Here's a

9   declaration, Your Honor.  The Court didn't buy it.

10         And the other argument that is made today not the

11  office that this claim was reviewed.  It happened in the ERISA

12  office.  So what I am hearing is the Worcester office is bad.

13  The Chattanooga office is good.  It makes no sense.

14         They are trying to give a perception that there may be

15  some bad apples in the company, but they are found in the

16  northeast and not the good old southern folks.  It's a

17  different company.

18         At the heart this is the same company that is a

19  for-profit company.  We have a sufficient evidentiary basis to

20  show that claims are being reviewed backwards.  Financial

21  projections, downward pressure to the disability benefits

22  specialist and the director and their performance is being

23  reviewed to see if they are hitting their target goals.

24         THE COURT:  So let me ask UNUM's counsel this

25  question.  Since we are dealing here in the ERISA context and

1  we are dealing therefore in the group context, does your

2  company for those kinds of cases have projections for

3  terminations or expectations for what you call paid recoveries?

4         MS. PETT:  Well, in this case they admitted in the

5  case, in our admissions we admitted that in Miss Lagos' claim

6  because it was paid and then denied, would be called a paid

7  recovery.

8         Every insurance company has forecast.  If they didn't

9  they wouldn't be in business.  They have to figure out how many

10  claims are going to be paid.  How long the claims are going to

11  last and when they anticipate claims are going to be denied.

12         And in the group setting they don't do it on an

13  individual basis.  They do it based upon age, impairment, other

14  types of information that actuaries use that I could not even

15  begin to explain, Your Honor.

16         So I keep hearing these terms.  Every company has to

17  make targets and projections about what budget they have to

18  budget.  They need to know about how much money to set aside.

19  They need to know all these things to run a business.

20         THE COURT:  Right.

21         MS. PETT:  And they are trying to take what a company

22  used to run a business and some former disgruntled ex-employees

23  from an office who has nothing to do with this claim or these

24  types of claims and use that to say we need all this

25  information in this simple ERISA case for $5,000.

1          THE COURT:  So are these projections of paid

2    recoveries available to either Miss Cribbs or Miss Butler?

3          MS. PETT:  They were not available to Miss Cribbs.

4    They were not available to the people that handled the appeal.

5    And if I look at the affidavit, the director says that:

6          "As director I have never been advised or directed by

7    either my AVP or other supervisor to close or terminate any

8    specific claims or dollar amounts in any given time period or

9    that I am expected to do so.

10          I am not given claim closure targets, goals, or

11    quotas.  And my performance is not evaluated based on claim

12    outcomes.  I have never advised or directed my DBS that they

13    meet any claim closure targets, goals, or quotas.

14          I do not know what the reserve was on Miss Lagos'

15    claim nor did Miss Cribbs, the appeal specialist or the appeal

16    specialist supervisor.

17          Claims metrics were not considered or relied upon in

18    making the determinations that benefits were payable when the

19    claim was accepted in October of 2015, or Miss Cribbs, or me in

20    making the decision that benefits were no longer payable when

21    the claim was closed in February of 2017.

22          Claim metrics were also not considered or relied upon

23    in making the determination to uphold the termination of Lagos'

24    benefits by the appeal specialist or Mr. Roop."

25          So what counsel is trying to say is that I submitted a

1  false declaration.

2          MR. DABDOUB:  I said no such thing.

3          What I said, Your Honor, is that the very same

4  declaration submitted in the *Gray* case by someone else.  The

5  depositions of the assistant vice presidents who these

6  directors report to testify to the contrary of that

7  declaration.

8          THE COURT:  Is that declaration that you just read

9  from part of the record?

10          MS. PETT:  We filed it as part of the --

11          THE COURT:  In this case?

12          MS. PETT:  In this case and we sent it to you as well.

13          And your Honor, that was a misstatement.  This

14  director, Amy Butler, did not report to those individuals who

15  testified in that other case.

16          MR. DABDOUB:  She didn't report to them, but she

17  reported to an assistant vice president.  UNUM has structured

18  their business in units.  We don't know who her AVP is, but

19  what we do know is generally the way they are structured and

20  that this information is being shared through to the claims

21  department.

22          It is not that they are projecting how much money to

23  set aside to pay claims into the future.  It's the opposite.

24  They are setting the targets to eliminate claims and they are

25  backwards from it.

1          THE COURT:  I understand.

2          MR. DABDOUB:  It is $5,000 a month, but if you run the

3    present value calculation it is over a million dollars.

4          MS. PETT:  And Your Honor, with respect to this whole

5    declaration thing, it is not the same declaration that was

6    submitted in the other case.

7          I assisted with the preparation of it.  I helped

8    prepare it.  It was revised.  It is not something that UNUM

9    gave to us and it is truthful, as you know.  I just don't know

10   what to say about that.

11         MR. DABDOUB:  We have the *Gray* declaration if the

12   Court would like to --

13         THE COURT:  What you are saying is the same

14   declaration that was filed in California?

15         MR. DABDOUB:  Yes.

16         THE COURT:  You mean it was the same affiant or the

17   same declarant, or just that the language was identical?

18         MR. DABDOUB:  The language is virtually identical.

19         The only difference being case specific information

20   such as my client's name, the dates of terminating her

21   benefits, and the actors on the behalf of UNUM.

22         THE COURT:  And when that declaration was submitted to

23   the California court, was that concerning an individual claim

24   which is non ERISA, or was it a group claim which was ERISA?

25         MR. DABDOUB:  It was an ERISA case.  We submitted it

1  without notice of authority.  It is *Gray v. UNUM*.

2           THE COURT:  Right.

3           MR. DABDOUB:  The opinion was handed down about three

4  months ago.

5           THE COURT:  September 21st of 2008.

6           MR. DABDOUB:  So the arguments we are hearing today

7  are the exact arguments made in the *Gray* case when you look at

8  the briefing UNUM submitted.  Including that this didn't happen

9  in this office.  It happened in another office.

10          THE COURT:  So this particular issue that we are

11 talking about now, the issue of paid recoveries and the

12 forecast, or predictions, or actuarial analysis, that overall

13 umbrella issue deals with the concept of paid recoveries which

14 you list as topic A?

15          MR. DABDOUB:  Yes, sir.

16          THE COURT:  Does it relate to B, C, or D?

17          MR. DABDOUB:  It relates tethered to B.

18           B in the sense when there is a paid recovery and

19 termination of benefits, they no longer have to keep the

20 reserves.  So A and B kind of go hand-in-hand.

21          THE COURT:  So let me make this observation.

22           Most discovery hearings that I have, I rule from the

23 bench because I am sufficiently familiar with the concepts and

24 the arguments and the law that I feel comfortable making a

25 ruling.

27

1        I am pretty sure that this concept that we are talking

2   about now, paid recoveries and the projections of how much

3   money a disability carrier can save, or from the Defense

4   perspective, the normal standard actuarial projection, I think

5   this is the first case for me that I have ever had these issues

6   involved.

7        So, for me, I am not on firm footing.  The ground is a

8   little bit squishy beneath me.  So I think I might benefit from

9   a brief memorandum of law.  I know you filed points and

10  authorities and I know you made reference to the cases with a

11  brief parenthetical summary of the holdings.  So thank you for

12  following the provisions of my discovery procedures order.

13       But every once in a while I ask for memorandum or

14  every once in a while a party will file a motion before a

15  discovery hearing for relief to file a memorandum.  Nobody did

16  that here.  I am not faulting you.  You certainly didn't know

17  that I had never confronted this issue before.

18       Maybe you thought I was wiser than I actually am, but

19  I would like to get a memorandum on this issue of paid

20  recoveries, what kind of discovery it would generate, or not

21  generate, based on the specifics of this case.

22       Namely, that it is an ERISA case, as opposed to an

23  individual case, and that there is a declaration filed by Miss

24  Butler.  So you are going to have to address that as well.

25       So let's figure out, first, what your suggestions are

1    for the length of the memorandum and, then, we will figure out

2    a deadline.  What I have in mind is just a simultaneous filing.

3         Not memo, response, reply.  We are not going to carry

4    that out *ad nauseam*.  I think we are all pretty much up to

5    speed and you in particular are pretty much up to speed of what

6    the issues are.

7         So I am looking for simultaneous filing and I am not

8    going to necessarily hold you to this, but from the Plaintiff's

9    perspective, what is your thought on a reasonable page limit

10   for this memorandum?

11        MR. DABDOUB:  I would say no more than five pages

12   because --

13        THE COURT:  Five double-spaced pages.

14        MR. DABDOUB:  Indeed.

15        THE COURT:  And for the Defense?

16        MS. PETT:  Your Honor, I think it would take a little

17   longer than five pages to explain this whole process.

18        THE COURT:  All right.  So I appreciate that comment,

19   more than five, but that could mean seven and it could mean

20   ten.

21        MS. PETT:  Ten.

22        THE COURT:  Ten double-spaced pages.  All right.  So

23   we will go with that.

24        There used to be a Judge on the Eleventh Circuit Court

25   of Appeals Judge Birch.  Have you ever argued a case in front

1  of Judge Birch?

2         MS. PETT:  I don't think so.

3         THE COURT:  No?

4         MR. DABDOUB:  No.

5         THE COURT:  So Judge Birch was fond of saying when he

6  was talking about these page limits, you don't necessarily have

7  to make it aspirational.

8         So if you have ten pages, great, but if you can get it

9  done in less, fine.  So, for example, if you could get it done

10  in five pages, which was your initial suggestion was, there is

11  no need to turn in ten if you think five will do it.

12         All right.  What about the timing?  What deadline is

13  reasonable from your perspective, Plaintiff?

14         MR. DABDOUB:  Well, I would suggest maybe two weeks.

15         THE COURT:  And what do you say, two weeks?

16         MS. PETT:  That sounds fine.

17         THE COURT:  Okay.  So two weeks from today would be

18  February 1st, which is actually my wedding anniversary.  And

19  that will not, in any way, factor into my analysis, but

20  February 1st is, in fact, 38 years.

21         MR. DABDOUB:  I regret we could offer the Court a more

22  respective anniversary gift.

23         THE COURT:  Well, just because you are filing on the

24  1st doesn't mean that I am going to be reviewing it on the 1st.

25  It just means that's the deadline.

1          You know, 38 years people ask me, my gosh, that's a

2  really long time, 38 years.  How do you do it?  What's the

3  secret to stay together that long?

4          And I am going to tell you the secret, quite frankly.

5  Both of us, my wife and I, we are in love with the same man.

6          You didn't understand, right?  You did understand, but

7  you just didn't laugh?  You know, the rule is, the Judge makes

8  a joke, you have to laugh.  I mean, come on.  You certainly

9  learned that when you were clerking for the Judge in

10  Jacksonville.  Maybe your Judge wasn't a particularly funny

11  Judge.  Who knows.

12          All right.  So a ten-page memo by February 1st.  We

13  will later on, probably Tuesday --- Monday is a federal

14  holiday.  I will issue a post hearing administrative order just

15  memorializing what my ruling is and explaining what the memo

16  will be about.

17          I know you know what it is going to be about, but to

18  the extent you need any additional comfort of pinpointing the

19  specific issue, the post hearing order issued on Tuesday or

20  Wednesday, we will lay that out for you.

21          Let's go to the next topic which is reserves.

22          MR. DABDOUB:  Your Honor, just briefly, could I just

23  point out that all the arguments they made in the *Gray* case and

24  it would seem to me they are precluded from relitigating the

25  same issue with the same arguments.

1          It is something that I think the Court should take

2     into consideration.  Especially as we consider judicial

3     efficiency.  You know, the *Gray* decision is only a few months

4     old on this exact topic based on the same information.

5          Of course, I would respectfully defer to the Court if

6     the Court does want the memorandum, but I would just suggest

7     that this is as road already traveled.

8          THE COURT:  So the *Gray* decision is a nonbinding

9     District Court case from a Magistrate Judge in the Central

10    District of California.

11         It may be very persuasive.  And maybe Magistrate Judge

12    Kato is the, you know, academic emperor of disability cases and

13    discovery and whatever Judge Kato says can be relied on or

14    maybe not.  I don't know.  I have to confess I am not familiar

15    with Magistrate Judge Kato and Magistrate Kato is probably not

16    familiar with my work either.

17         But it is a nonbinding decision and I would I still

18    like to get the benefit of your brief.  Especially linking it

19    to the specific representations of the declaration here.  I

20    know you say in large part it is similar to the declaration in

21    the California case.

22         I am going to guess maybe that in their memorandum or

23    in its memorandum, I should say, UNUM might try to distinguish

24    the memorandum filed there from the declaration filed here.

25    And likewise, you might want to point out to me the

1  similarities between the two declarations.

2       So, if you do, it will be helpful to me to have the

3  declaration from that case to compare it in this case.  And you

4  could certainly attach the declaration in the California case

5  to your memorandum here if you think that that is going to be

6  part of your argument and analysis.

7       MR. DABDOUB:  Okay.

8       THE COURT:  Next we go to reserves, or do you think

9  that it would make sense for me to postpone a ruling on that

10 until I issue a ruling on the paid recovery discovery?

11      MR. DABDOUB:  Well, being a man not known for his

12 patience, Your Honor, I would say that we already have a ruling

13 from this Court in the *Bayer v. Reliance Standard* case.

14      And there is a case where we have asked for reserves

15 and the Court granted it.  It's the same discovery request from

16 that case that we are using here.  So we already have your

17 input from a prior case on this discovery request.  That's also

18 in our notice of authorities.

19      THE COURT:  Your view?

20      MS. PETT:  Your Honor, in the *Bayer* case, I believe

21 the Reliance Standard Insurance Company argued to you that

22 absolutely no discovery could be had under ERISA.  I have not

23 taken that unreasonable position.

24      And in our notice of authorities we have cited cases

25 where the Court has only allowed discovery of reserves when

1    someone has considered reserves.

2            Once again, we said that reserves were not considered

3    here and there is also one more important distinction.  In an

4    individual claim reserves are set per policy.  In group claims

5    reserves are set in the aggregate.

6            Reserves are not set by the claims examiners.  The

7    reserves are not reviewed by the directors or anyone.  The

8    reserves are not even set on a claim by claim basis.  They are

9    set like the other things like projections that I talked about

10   based on age and all these other demographics.

11           So there would be absolutely no reason for a reserve

12   to be relevant to whether the decision in this case, that

13   whether the conflict was a factor.

14           MR. DABDOUB:  May I just briefly respond?

15           THE COURT:  Sure.

16           MR. DABDOUB:  Without violating any confidentiality,

17   may I just tell the Court that based on this Court's prior

18   rulings in allowing us to get reserves, what she has just said

19   is not accurate.

20           I will say no more and those were ERISA cases.  And

21   the assistant vice president too from UNUM has testified that

22   the directors were given reserve information and the directors

23   are --

24           THE COURT:  In this case?

25           MR. DABDOUB:  Well, no, that's why I am here because I

1   want to know if that happened in this case.  We know this

2   happened in other cases and they had a plan in place for this

3   to happen.

4          My reason for being here is can I have discovery for

5   my client to find out if that infection spread into my client's

6   claim.

7          THE COURT:  Right.  I understand your preference.  I

8   understand your theory, but we have here a declaration filed by

9   the manager -- what was the title?

10         MS. PETT:  The director.

11         THE COURT:  The director rejecting all of those

12  theories, as I understand it, based on the excerpts that were

13  read to me about ten or 15 minutes ago.

14         So, yes, it may have happened in the other office in

15  Worcester Massachusetts, and I am not going to say that was a

16  bad apple office or an evil office.  Maybe it was just

17  different, but for this particular claim here, there is a

18  declaration saying to the contrary.

19         So I guess your theory is you do not believe the

20  declaration.

21         MR. DABDOUB:  I am a bit beside myself in the sense

22  that what else would UNUM file, but a declaration from someone

23  saying, no, we didn't do that.

24         But I have information separate and apart from this

25  individual from an assistant vice president that said, yes, we

1  do do that.  So, at a minimum, we know that we have conflicting

2  information coming from within UNUM and that gives a

3  justifiable basis for Plaintiff to conduct discovery.

4          It should not have been lost upon us that my client is

5  35 years old and bed-bound.  They could have medically examined

6  her and we told them at the time she's bed-bound.  Come see

7  her.  Come examine her.  They closed their eyes to that

8  information and marched on to terminate her benefits.

9          THE COURT:  What I would like to you to do is, also as

10 an attachment to your memorandum, attach the excerpts from the

11 deposition that you are referring to.

12         I guess that was taken in a Massachusetts case, but

13 then I hear the Defense saying, well, Judge, those might be

14 one-sided excerpts and we may want to put it into context.

15         Do you have that entire deposition handy?

16         MS. PETT:  No.

17         THE COURT:  Do you have the entire deposition handy?

18         MR. DABDOUB:  Yes, Your Honor.

19         THE COURT:  All right.  So --

20         MR. DABDOUB:  With the exception of the redacted

21 portions.

22         THE COURT:  All right.

23         MS. PETT:  But the redacted portions might answer the

24 question and that's the problem.  I think these documents, I

25 don't know how they obtained documents that are redacted.

1          MR. DABDOUB:  Public findings and I would be happy to

2  see the redacted versions.  I am very curious to see it.

3          MS. PETT:  Well, those are probably subject to some

4  sort of confidentiality.

5          THE COURT:  You have redacted or unredacted?

6          MR. DABDOUB:  I have the -- it's full deposition

7  transcripts, but there are certain portions of the deposition

8  that are redacted.

9          THE COURT:  That are blacked out?

10          MR. DABDOUB:  Yes.

11          THE COURT:  And who did that redaction process?

12          MR. DABDOUB:  I believe that was -- and I am going out

13  on a limb saying that the Court in that case ordered those

14  portions of the depositions to be redacted.  What we have

15  obtained is from public filings.

16          THE COURT:  Okay.  So you don't have the unredacted

17  versions?

18          MR. DABDOUB:  No, but what I do have, though, is the

19  majority of it is unredacted.  There are only small portions

20  that are redacted and the portions that I have show and they

21  testify to everything that I have told the Court today.

22          Now if counsel would like to give me the unredacted

23  portion, I would be happy to accept it because it would prove

24  my point more.

25          MS. PETT:  I have no authorization to provide

 1  something that I have not even reviewed.  I mean --

 2       THE COURT:  So my observation is to the extent you

 3  think Plaintiff's counsel is strategically going to file

 4  deposition excerpts to promote only his view, and somehow

 5  shield from my consideration other portions which might

 6  undermine his position, I am requiring him to file the entire

 7  deposition transcript, which contains some redactions which he

 8  has never seen.

 9       So it is not like he has some devious strategic plan

10  to redact portions.  Somebody, not him, made those redactions,

11  right?

12       MS. PETT:  Your Honor, I am just struggling with the

13  fact that group reserves are set differently than individual

14  reserves.  So I don't see --

15       THE COURT:  I know, but you will be able to manifest

16  that struggle in your memorandum of law.

17       MS. PETT:  Oh, we are going to write it on the

18  reserves, too?

19       THE COURT:  No, but it gets to the -- part of the

20  difference is your argument is that there is a distinction

21  between individual plans and group plans, right?  Isn't that

22  one of your primary arguments?

23       MS. PETT:  Yes.

24       THE COURT:  Okay.  So to the extent you want to make

25  that point you will be able to.  But, in any event, I want you

1  to file either separately or as an attachment to your

2  memorandum, the entire deposition transcript.

3  　　　　　Was it of the assistant vice president?  Is that the

4  person you are talking about?

5  　　　　　MR. DABDOUB:  Yes, Your Honor.

6  　　　　　THE COURT:  All right.

7  　　　　　MS. PETT:  Could we ask him to identify which

8  individual he is talking about?

9  　　　　　THE COURT:  I guess you will find it out when he files

10  it but --

11  　　　　　MS. PETT:  Well, how can I respond to it if I don't

12  know which one it is, Your Honor?

13  　　　　　THE COURT:  You are a very energetic lawyer and so you

14  have a tendency to sort of cut me off.

15  　　　　　MS. PETT:  I'm sorry.

16  　　　　　THE COURT:  So rachet it down about two notches, would

17  you please?

18  　　　　　MS. PETT:  Yes, Your Honor.

19  　　　　　THE COURT:  So you are going to file either separately

20  or as an attachment to your memorandum, the entire deposition

21  transcript of the assistant vice president whose name is what?

22  What's his or her name?

23  　　　　　MR. DABDOUB:  Anthony Scuderi.

24  　　　　　THE COURT:  Yes.

25  　　　　　MR. DABDOUB:  And Peter Paul.

1      THE COURT:  So you have two deposition transcripts.

2      MR. DABDOUB:  Two assistant vice presidents.

3      THE COURT:  So you will file both of those.

4      You now know their names because he has mentioned it

5  in court and you will see those names again when they are filed

6  in the record.

7      So, in addition to filing the entire deposition

8  transcript, you will also flag for me those page numbers that

9  you think are the most relevant.

10     MR. DABDOUB:  Your Honor, I should correct myself,

11  Paul Peter's deposition transcript we have, we were only able

12  to retrieve -- we were only able to retrieve the entire

13  deposition.

14     THE COURT:  You can only file what you have.

15     MR. DABDOUB:  That's right.  This is what we were able

16  to get from the public domain.

17     THE COURT:  You will file those two deposition

18  transcripts to the extent that you have them.

19     MR. DABDOUB:  Correct.

20     THE COURT:  You can't create what you don't have.

21     MR. DABDOUB:  We will not withhold anything.

22     THE COURT:  But so you will flag for me the pages that

23  you think are most relevant.

24     But, actually, now that I think about it, to be fair

25  to the Defense because we are going to have simultaneous filing

1  and they are not going to see these transcripts under the

2  current regime, the current protocol, until you file your

3  memorandum.

4          So, instead, you are both going to file this

5  memorandum on February 1st.  However, one week earlier, by the

6  25th, you are going to send to Defense counsel those two full

7  deposition transcripts to the extent that you have them.

8          That way they will know in advance what the

9  depositions say.  And to the extent that they want to point out

10 to me other portions of the deposition, put things in context,

11 raise counter arguments, they can do so.

12         If I don't do it that way, they are going to be sort

13 of ambushed by this transcript and they won't have an

14 opportunity to comment on them.

15         MR. DABDOUB:  If I could defer to the Court, I could

16 hardly imagine that UNUM is ambushed by their own depositions.

17         THE COURT:  Maybe this particular lawyer has never

18 seen it before.  And even if she has it available, it is easier

19 and more efficient to do it this way.  In any event, that's the

20 procedure that we are going to use.

21         Katie, do you have that down?

22         THE COURTROOM DEPUTY:  Yes.

23         THE COURT:  Okay.  So now we are going to go to the

24 reserves, which is request for production number 12.  So Miss

25 Butler's declaration is Docket Entry 26, ECF 26.  Why do I not

1  have the request?  Bear with me just a minute, please.

2      All right.  Here it is.  Request for production number

3  12.  This deals with reserves.  I am going to defer ruling on

4  this one as well because it is sort of, in a way, linked to the

5  topic that we were talking about paid recovery.  So I am not

6  going to rule on that this afternoon.

7      Next we have Category C, a change in Miss Lagos'

8  condition, interrogatory number 4.  Interrogatory number 4

9  identify in detail any change in Miss Lagos' medical condition

10  occurring between October of 2015 and February of 2017, et

11  cetera, objections.  And then, UNUM basically says we are

12  directing you to the administrative record.

13      MR. DABDOUB:  Yes, Your Honor.

14      Again, we have narrowed it to our discovery.  This is

15  an exact replica of discovery we've had in previous ERISA cases

16  which this Court has granted.

17      And the interesting twist here is that they have

18  refused to answer what changed with our client's condition, but

19  in a request for admission they denied that nothing has

20  changed.

21      So if you take the converse of that UNUM's position is

22  something has changed.  But if they are of that view, my client

23  is entitled to know what they believe changed.

24      THE COURT:  Your response?

25      MS. PETT:  Your Honor, the discovery as we all

1  stipulated to at the beginning of this hearing is that we are

2  limited to the *Cerrito* factors.  None of these factors relate

3  to whether there was a change in the Plaintiff's medical

4  condition.

5        The burden of proof in an ERISA case is on the

6  Plaintiff to show continuing entitlement to benefits.  UNUM is

7  under no obligation to show a change.  It just has to show that

8  its decision was either correct and/or reasonable at the time

9  it was made.

10        So this is more of a request that you would see in a

11  state law case where once an insurance company approves the

12  claim, the burden of proof shifts to that insurance company to

13  prove a change in the condition, but that's not what we are

14  dealing with here.

15        THE COURT:  But that's not exactly what the

16  interrogatory asks.  It doesn't ask for you to list all changes

17  in her condition, her medical condition.  It says detail

18  changes in her medical condition that were known to you that

19  occurred between October of 2015 and February of 2017.

20        And if the answer is none, we weren't aware of any

21  medical condition, then, that's your answer.  And if you knew

22  that there were certain conditions, then, you will simply

23  answer that under oath.  So I will give you one week to get

24  that done by next Friday, please, a better answer to

25  interrogatory 4.

1        Next we go to the Category D, documents excluded from

2    the claim file, request for production number 21.

3        MR. DABDOUB:  I think we could handle this is an

4    expeditious manner.  Within the claim file produced litigation

5    there is a note in there that -- and I am paraphrasing -- that

6    says documents have been deleted from the claim file.

7        We have since conferred with counsel for UNUM who has

8    responded to us saying, in terms of deleting documents from the

9    claim file, we can confirm none were deleted.

10       I then brought up that the privilege log showed that

11   documents were removed from the claim file on the basis of

12   attorney/client privilege.  And said, well, I want to clarify

13   that I am not drawing a distinction between deleted or removed.

14       If something was once in the claim file and taken out,

15   I would like to know about it.  It is that simple.  I just

16   don't want to be playing semantics.  I would like them to run a

17   proper search and let us know what was removed.

18       THE COURT:  Were there any documents removed from the

19   claim file?

20       MS. PETT:  None other than privileged documents which

21   we have agreed to turn over under the fiduciary exception.

22       THE COURT:  So you are going to be turning over the

23   privileged documents?

24       MS. PETT:  Yes, Your Honor.

25       THE COURT:  All right.  So that should satisfy your

1  concern.  We have the Defense lawyer on the record in a federal

2  courtroom saying that no documents were removed other than the

3  privileged documents, which we will be turning over to you.  It

4  sounds like a pretty conclusive answer to me.

5           When do you think you will get those documents to the

6  Plaintiff?

7           MS. PETT:  I could get them to him next week, Your

8  Honor.

9           THE COURT:  Okay.  Next Friday you will produce the

10  documents that you said you would produce.  Namely, the

11  privileged documents removed from the claim file.

12           Next we go to request for production.  The first one

13  has to do with paid recoveries.  So I am going to postpone that

14  until I get the benefit of your briefing.

15           Change in Miss Lagos' condition.  This is request for

16  admissions number 37 and 38.

17           MR. DABDOUB:  Your Honor, we could drop these.

18           THE COURT:  Okay.  Consider them dropped.

19           Next review of Miss Lagos' claim and these are several

20  requests for admissions.  Could these be dropped as well?

21           MR. DABDOUB:  I am afraid not.

22           THE COURT:  Worth a shot, right?

23           MR. DABDOUB:  Why not.

24           THE COURT:  Why not.

25           MR. DABDOUB:  Your Honor, this falls under the broad

1  category of facts known to Defendant at the time it terminated

2  benefits clearly within the *Cerrito* factors.  The Court is

3  aware of facts known to the Defendant are not necessarily put

4  in their own claim file and, therefore, were permitted

5  discover.

6          These are directed at questions like why did you admit

7  that you could have gotten an independent medical examination,

8  for example.  That's number 20.  Number 21 is admit that UNUM

9  knows that there --

10         THE COURT:  I'm sorry.  So number 20 admit that an

11 in-person examination provides valuable information.  Why do

12 you think that is improper?

13         MS. PETT:  I don't think there is any *Cerrito* factor

14 that that would relate to.

15         THE COURT:  Any other argument?

16         MS. PETT:  No, Your Honor.

17         THE COURT:  So you will provide that by next Friday,

18 please.

19         Next we go to number 21?

20         MR. DABDOUB:  21 is asking for an admission that our

21 client's medical condition, which is called ME/CFS, that there

22 is no specific testing that was requested of her prior to her

23 claim being approved.  The purpose of this --

24         THE COURT:  Your response to number 21?

25         MS. PETT:  It says that no specific testing was

1  requested of Miss Lagos prior to her claim being approved.

2          THE COURT:  Right.

3          MS. PETT:  What type of testing?

4          And once again, it is going more to, you know, it

5  doesn't relate to the *Cerrito* factors.  The competence of the

6  person involved, the information considered.  Whether technical

7  assistance was required.  Whether there was a conflict.

8          THE COURT:  So you will provide a response by next

9  Friday, please.

10          Next, we go to number 28.

11          MR. DABDOUB:  28 UNUM --

12          THE COURT:  Bear with me just a minute, please.

13          Your response to number 28?

14          MR. DABDOUB:  Plaintiff or Defense?

15          THE COURT:  UNUM.

16          MS. PETT:  It calls for an expert opinion.

17          We have to do research to determine whether ME or CFS

18  does not have any component which is related to a -- whether it

19  relates to a mental health contention.

20          And we cited case law in our notice of authority that

21  we are not required to make admissions as to information that

22  would require an expert opinion, Your Honor.

23          THE COURT:  Why is this even relevant?

24          What difference does it make if ME/CFS is or is not a

25  mental health condition?  Is there some kind of --

1          MR. DABDOUB:  To terminate an old client.  I'm sorry.

2          THE COURT:  Is the some kind of exclusion for a mental

3    health condition?

4          MR. DABDOUB:   Yes.

5          THE COURT:  There is?

6          MR. DABDOUB:  Yes.

7          MS. PETT:  But the claim was not denied on that basis.

8    The mental health condition was not considered as part of this

9    claim.

10         THE COURT:  What was the basis of the termination?

11         MS. PETT:  The claim was she was no longer disabled as

12   defined by the policy.  And due to her chronic fatigue syndrome

13   and all the physical conditions, it was never asserted that was

14   a mental condition.  So, once again, as you said --

15         THE COURT:  So if the mental health condition was not

16   a basis for the termination, what role does it play in this

17   case?

18         MR. DABDOUB:  UNUM interjected mental health into the

19   claim by portraying the client, as her condition, to be

20   mentally driven as opposed to physical.

21         So we would like an admission that UNUM as a

22   disability insurance carrier acknowledges, for example, the CDC

23   website says that ME/CFS is a physical condition.

24         They terminated her benefits.  They portrayed the

25   client's condition as a mental health issue and not a physical

1  disability.  Although that was not the basis for terminating

2  her benefits.

3          THE COURT:  So you are suggesting that UNUM's position

4  is that this was like a psychosomatic --

5          MR. DABDOUB:  Indeed.

6          THE COURT:  Situation or exaggerated situation?

7          MR. DABDOUB:  Exactly.

8          THE COURT:  I am not going with you there.

9          You don't need to provide a response to -- 28 I don't

10  think it is within the scope of discovery under Rule 26.  So no

11  response necessary for 28 request for admissions.

12          Next we have 33, admit that any CFS can produce

13  cognitive impairments similar or worse than with patients with

14  progressive dementia.

15          Why is that involved in this case?

16          MR. DABDOUB:  Our client, a trial lawyer, underwent a

17  newer psychological evaluation by one of the top physicians in

18  the country.  The report came back that she had severe

19  cognitive impairment.

20          In terminating her benefits UNUM said we don't believe

21  you have severe cognitive impairment because your impairments

22  from ME/CFS is so extreme that only patients with dementia

23  could experience it.

24          Whereas, her doctor said, no, that is consistent with

25  ME/CFS.  You can have that level of cognitive impairment.

1          MS. PETT:  And once again, relevance and it calls for

2    an expert opinion.  That is not something that you can just

3    look at and say admit it or deny.  There would have to be

4    medical research performed to make that determination.

5          And what does it have to do with whether the Plaintiff

6    was capable or incapable of performing the material substantial

7    duties of her occupation and whether the decision was correct

8    and/or reasonable.

9          THE COURT:  No further response needs to be provided

10   on 33.

11         34?

12         MR. DABDOUB:  34 and 35 are similar.

13         If the Court is not inclined to require a response on

14   33, then, I am assuming that the Court will similarly rule

15   through 35.

16         THE COURT:  Correct.  No further response needed on

17   request for admissions 34 and 35.

18         36?

19         MR. DABDOUB:  That request for admission is somewhat

20   self-explanatory, Your Honor.

21         THE COURT:  And therefore?

22         MR. DABDOUB:  They are not answering any of these.

23   They just objected.

24         Your Honor, request for admissions are a tool that

25   allows us to narrow the issues at briefing.  If we get UNUM to

1   admit certain things that one would see more elementary, it

2   eradicates the need to spend two or three pages on some of

3   these issues briefing it.

4            THE COURT:  Your position?

5            MS. PETT:  Your Honor, with respect, it's the same

6   position as to the other ones that you sustained.

7            Also, with respect to briefing on an ERISA arbitrary

8   and capricious case, the Court considers the administrative

9   record and the information that the administrator considers to

10  make the determination as to whether the decision was

11  reasonable and/or correct.

12           What would it matter whether it causes definite

13  argument that Plaintiff is making that her condition precluded

14  her from engaging in and working memory and having executive

15  functioning, but it is not something that should be subject to

16  a request for admissions in this type of case.

17           THE COURT:  Same ruling on number 36, no further

18  response necessary.

19           Number 39?

20           MR. DABDOUB:  We would like UNUM to admit that it was

21  a fact known to them that at the time they terminated our

22  client's benefits, none of her treating physician's opinions as

23  her inability to practice law had changed.

24           Let me be frank.  If I get UNUM to admit that which

25  they should, because that's the reality, it weakens their

1  position significantly to seriously defend this lawsuit.

2          THE COURT:  So I am going to actually modify the

3  phrasing of number 39 because I think it could be phrased in a

4  more appropriate way and I think you probably would agree.

5          I think it would be better phrased:  Admit that UNUM

6  was not aware between October of 2015 and February of 2017 of

7  any change in opinions by Miss Lagos' treating physicians about

8  her ability to work in her occupation.

9          Isn't that really what you are getting at?

10         MR. DABDOUB:  You verbalized it in the English

11 language better than I could, yes.

12         THE COURT:  So for number 39, please respond to that

13 by next week, next Friday.

14         So the good news is, according to my agenda, I don't

15 think we have anything further to do here.  Further work for me

16 to do later when I receive your briefs, but for today I think,

17 as we say, we are good to go, correct?

18         MR. DABDOUB:  Yes, Your Honor.

19         THE COURT:  Defense, correct?

20         MS. PETT:  Yes, Your Honor.

21         THE COURT:  So you were predicting we needed an hour,

22 but we took an hour and-a-half and ten minutes or something

23 like that.  So fairly close.

24         So thank you folks for your presentation and your

25 authorities and your organized approach.  It was very helpful.

1    I look forward to receiving your briefs.

2            Unfortunately I think I am sending you out into Friday

3    afternoon traffic, but so am I.  In any event, take care,

4    folks.  We are in recess.  Bye now.

5            MR. DABDOUB:  Thank you, Your Honor.

6            THE COURT:  All right.  Bye.

7             (Thereupon, the proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATE

3

4        I hereby certify that the foregoing transcript is an

5   accurate transcript of the audio recorded proceedings in the

6   above-entitled matter.

7

8

9

10
    01/11/19                      Bonnie Joy Lewis,
11                       Registered Professional Reporter
                            CASE LAW REPORTING, INC.
12                          7001 Southwest 13 Street,
                          Pembroke Pines, Florida 33023
13                              954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25